IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DANIEL LOA, | ) | |
| | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WELLPATH LLC | ) | Jury Demand |
| | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT

COMES NOW Plaintiff Daniel Loa ("Plaintiff" or "Mr. Loa"), by and through undersigned

counsel, alleges as follows:

I. PARTIES

1.      Plaintiff Daniel Loa is an Asian-American man born in Taiwan and a resident of Tennessee.

2.      Defendant Wellpath, LLC ("Wellpath") is a Delaware limited liability company with its

principal place of business in Nashville, Tennessee and doing business throughout the United

States.

II. JURISDICTION AND VENUE

3.      This action arises under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 and

the False Claims Act, 31 U.S.C. § 3730(h) as well as respective state false claims acts.

4.      This Court has jurisdiction under 28 U.S.C. § 1331.

5.      Venue is proper under 28 U.S.C. § 1391.

1

## III. ADMINISTRATIVE EXHAUSTION

6. Plaintiff timely filed a Charge of Discrimination with the EEOC alleging racial discrimination, retaliation, and hostile work environment.

7. The EEOC issued a Notice of Right to Sue, and this action is timely.

## IV. FACTUAL ALLEGATIONS

8. Plaintiff joined Wellpath on January 3, 2022 as a Financial Analyst.

9. Plaintiff excelled in his role, consistently receiving "exceeds expectations" performance evaluations.

10. In July 2022, Wellpath promoted him to Finance Director.

11. Clients and regional vice presidents repeatedly praised his work.

12. In early 2023, Plaintiff discovered that Wellpath was paying him less than white Finance Directors with similar or lesser experience.

13. Plaintiff reported the disparity in writing to Cindy Watson, Chief Operating Officer, and other senior leadership.

14. On or about March 14, 2024, Sam Britton, President of State and Federal Operations, told Plaintiff he was meeting with Ms. Watson to discuss Plaintiff's pay disparity complaint.

15. David Watson and Ben Slocum were also aware of Plaintiff's complaints.

16. After his complaint, Plaintiff was told that David Thompson had complained about his complaint to higher-ups, expressing displeasure that he raised the issue of racial pay disparity.

17. Wellpath did not investigate or correct the disparity on its own.

2

18.     Plaintiff ultimately received a raise only because the state client he supported demanded that Wellpath pay him more, not because Wellpath took corrective action.

19.     In September 2023, when the Divisional CFO role opened, Wellpath did not consider or interview Plaintiff in retaliation for his complaints about pay disparity.

20.     Instead, Wellpath split the role and promoted two less-experienced white colleagues to "Senior Director of Finance," blocking Plaintiff's advancement.

21.     Throughout his time working for Wellpath, Plaintiff was subjected to racially offensive comments from coworkers and leaders.

22.     One coworker said referencing a meeting: "Good thing Dan wasn't there—he would have thrown off the pure white racial demographics."

23.     The coworker stated the foregoing in a text message thread with an executive of Wellpath and the executive did nothing to correct or curtail the behavior.

24.     In the same thread, another co-worker remarked: "Can't be giving off any indications that we care about minorities."

25.     When Plaintiff was assigned to support Maine and Vermont, a high level executive joked: "Glad Dan got Maine and Vermont… They gonna have him building railroads and cooking ramen stat."

26.     Another coworker added: "Don't forget importing opium."

27.     At no point was anyone disciplined or educated on their remarks.

28.     Throughout his employment, senior executives made coded remarks about Plaintiff's "cultural fit," calling him "too quiet" and "not assertive enough," stereotypes tied to his race and national origin.

29.     Plaintiff was excluded from executive meetings, leadership programs, and high-visibility projects routinely given to white peers.

30.     Plaintiff submitted multiple written and verbal complaints in 2023 and 2024 documenting discrimination, pay inequity, and exclusion.

31.     Wellpath acknowledged the complaints but took no corrective action.

32.     Instead, retaliation escalated. Plaintiff went under increased scrutiny, removal of responsibilities, and further exclusion.

33.     In early 2025, Plaintiff  reported to Wellpath leadership—including Marcus Gadon and Evelyn Reinhardt—that Wellpath was mishandling millions of dollars in state and federally reimbursed pass-through funds under the Maine and Vermont Department of Corrections contracts.

34.     Plaintiff explained that Wellpath was submitting advance invoices based on detailed, jointly approved budgets, receiving immediate payment from the states, and then deliberately refusing to pay the vendors whose services those funds were earmarked to cover.

35.     Plaintiff further reported that senior leadership, including former CFO David Waltzer, was attempting to retain pharmacy credits and other federally reimbursed savings that were contractually required to be passed through to the states.

36.     After Plaintiff escalated these concerns in early 2025—warning that unpaid vendor exposure for Maine and Vermont had reached approximately $3–5 million—Wellpath responded by restricting his access to financial systems and data necessary to perform his duties as Finance Director.

37. At the same time, Plaintiff was subjected to repeated comments about his "culture" and other remarks reflecting racial and ethnic bias, which intensified as he continued raising concerns about Wellpath's misuse and diversion of earmarked government funds.

38. On April 18, 2025, shortly after Plaintiff again reported the growing unpaid vendor liabilities and Wellpath's continued retention of state and federal pass-through funds, Wellpath abruptly revoked his IT access during business hours and terminated his employment without warning, without prior discipline, and without any legitimate performance-based justification.

39. Plaintiff had never received any warnings, corrective action, or performance concerns.

40. Wellpath accused him of unspecified "suspicious activity."

41. The alleged activity involved use of a mouse juggler, which had been explicitly approved by Plaintiff's manager's manager and was commonly used by others without consequence.

42. White employees who engaged in the same conduct were not disciplined.

43. On April 23, 2025, a commissioner at the Maine Department of Corrections formally requested that Wellpath reinstate Plaintiff because of the high quality of his work.

44. Wellpath ignored the request and prevented the client from rehiring or continuing to work with Plaintiff, further harming his career.

45. The discriminatory and retaliatory conduct—including unequal pay, racial harassment, denial of promotion, exclusion, and termination—constitutes a continuing violation from at least June 2023 through Plaintiff's termination and beyond.

V. CLAIMS FOR RELIEF

COUNT I – Title VII Racial Discrimination, Retaliation and Hostile Work Environment

46. Plaintiff incorporates all preceding paragraphs.

5

47. Defendant discriminated against Plaintiff because of his race and national origin by paying him less than similarly-situated white colleagues, denying him a promotion in favor of less-qualified white employees, subjecting him to racially-coded stereotypes and derogatory remarks, excluding him from opportunities routinely afforded to white peers, and ultimately terminating his employment on pretextual grounds.

48. Plaintiff engaged in protected activity by complaining about discrimination and pay inequity.

49. Defendant knew of these complaints.

50. Defendant retaliated by excluding him, scrutinizing him, restricting his access, terminating him, and blocking a client's attempt to reinstate him.

51. Plaintiff was subjected to unwelcome harassment based on race and national origin, including explicit racial comments and coded stereotypes.

52. The harassment was severe or pervasive, altered the conditions of employment, and created an abusive working environment.

53. Defendant's own executives were direct witnesses or participants in the harassment and did nothing.

COUNT II – § 1981 Race Discrimination, Retaliation and Hostile Work Environment

54. Plaintiff incorporates all preceding paragraphs.

55. Defendant intentionally discriminated against Plaintiff in the making, performance, and termination of his employment contract because of his race by paying him less than similarly-situated white colleagues, denying him advancement in favor of less-qualified white

6

employees, subjecting him to racially derogatory comments and stereotypes, marginalizing him within the organization, and ultimately terminating him on pretextual grounds.

56.     Plaintiff engaged in protected activity by complaining about race-based discrimination.

57.     Defendant retaliated by escalating scrutiny, removing responsibilities, terminating him, and blocking a client's reinstatement request.

58.     Plaintiff was subjected to severe or pervasive racial harassment, including explicit racial slurs and stereotypes.

59.     Defendant failed to stop the harassment and instead retaliated against Plaintiff.

60.     Defendant's conduct violated § 1981.

COUNT III – Retaliation in Violation of the Federal False Claims Act, the Maine False Claims Act, and the Vermont False Claims Act

*31 U.S.C. § 3730(h); 5 M.R.S. § 213; 32 V.S.A. § 632*

61.     Plaintiff incorporates all preceding paragraphs as if fully stated herein.

62.     At all relevant times, Defendant contracted with the Maine Department of Corrections ("MEDOC") and the Vermont Department of Corrections ("VDOC") to provide comprehensive correctional healthcare services funded through a combination of state appropriations, federal Medicaid matching funds, and other federally reimbursed pass-through components, including pharmacy rebates and offsite medical costs.

63.     Under these contracts, Wellpath submitted monthly invoices in advance of services based on detailed, jointly approved annual budgets that specified staffing levels, medication costs, offsite care, supplies, and vendor services. Upon receiving these invoices, Maine and Vermont prepaid Wellpath millions of dollars each month with the expectation—and contractual requirement—that

7

Wellpath would use those earmarked funds to pay the vendors providing the actual medical services.

64. Although Plaintiff's role involved routine financial reporting, he was not responsible for auditing compliance, policing vendor payments, monitoring pass-through fund integrity, or investigating potential fraud.

65. While working, Plaintiff discovered that Wellpath was receiving advance payments from Maine and Vermont based on detailed, jointly approved budgets and then intentionally withholding those earmarked funds from the vendors who had already provided services.

66. Plaintiff further uncovered that unpaid vendor exposure for the Maine and Vermont contracts had grown to approximately $3–5 million and that senior leadership was attempting to retain pharmacy credits and other federally reimbursed savings that were contractually required to be passed through to the states.

67. Plaintiff also discovered that senior leadership, including former CFO David Waltzer, was attempting to retain pharmacy credits and other federally reimbursed savings that were contractually required to be passed through to Maine and Vermont. Plaintiff reasonably believed that this conduct constituted the improper retention of federal funds, false certifications of compliance, and fraudulent billing practices.

68. Plaintiff reported these concerns internally to management and/or leadership in good faith and with a reasonable belief that the conduct he observed could constitute violations of federal or state false-claims statutes, misuse of public funds, and false reporting.

8

69.     Plaintiff's internal reports, objections, and efforts to stop or address Wellpath's misuse of state and federally reimbursed funds constitute protected activity under the federal False Claims Act, the Maine False Claims Act, and the Vermont False Claims Act.

70.     Wellpath knew or should have known that Plaintiff's reports implicated potential violations of federal and state false-claims statutes, including false certifications, improper retention of federal pharmacy credits, misuse of earmarked public funds, and diversion of state and federally reimbursed pass-through dollars.

71.     After Plaintiff engaged in protected activity, Defendant retaliated against him by restricting his access to information, increasing scrutiny of his work, marginalizing him within the organization, and ultimately terminating his employment.

72.     Upon information and belief, after Plaintiff began raising concerns about Wellpath's misuse and diversion of state and federally reimbursed pass-through funds, Wellpath began increased monitoring and limiting Plaintiff's computer access in an effort to scrutinize his activity and search for a basis to discipline or terminate him. This increased monitoring led Wellpath to identify Plaintiff's use of a mouse-jiggler device—an item previously approved by management and entirely benign—which Wellpath then attempted to weaponize as a pretext for adverse action.

73.     Plaintiff had never received any warnings, corrective action, or performance-related discipline prior to his termination.

74.     Defendant's stated reason for termination was pretextual and inconsistent with its treatment of other employees.

75.     Defendant's retaliatory actions were taken because Plaintiff engaged in protected activity.

9

76.     As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other compensatory damages.

77.     Plaintiff is entitled to all available remedies under the applicable False Claims Acts retaliation provisions, including reinstatement, double back pay, interest, special damages, and reasonable attorneys' fees and costs.

VI. DAMAGES

78.     Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other compensatory damages.

79.     Defendant acted with malice or reckless indifference, entitling Plaintiff to punitive damages.

VII. PRAYER FOR RELIEF

Plaintiff requests Back pay, front pay, and lost benefits. Compensatory damages. Punitive damages. Attorneys' fees and costs. Pre- and post-judgment interest. Reinstatement or front pay. Any other relief the Court deems just and proper.

VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

/s/ Tess Heisserer
Tess Heisserer (BPR No. 37345)
EmployLegal
611 Commerce Street, Suite 2611
Nashville, Tennessee 37203
Tele: (615) 401-8055
theisserer@forceforwork.com

10

*Counsel for Plaintiff*

11